IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15-CR-00041 LRR |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES HESS, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MEMORANDUM REGARDING SENTENCING**

The United States provides this Memorandum regarding sentencing.

## Table of Contents

| | | |
|---|---|---|
| I. | Case Summary | 2 |
| II. | Factual Statement | 3 |
| III. | Defendant's Offense Level Should be Enhanced by 14 Levels Under USSG §2Q2.1(b)(3)(A) Because the Market Value of the Horns he Trafficked Exceeds $400,000 | 5 |
| IV. | Defendant's Offense Level Should be Enhanced by Two Levels Under USSG §3B1.1(c) Because of his Role in the Offense | 12 |
| V. | Conclusion | 14 |

1

## I. CASE SUMMARY

A. Witnesses: The United States may call the following witnesses:

1. Special Agent Justin Mays, Fish and Wildlife Service

2. Special Agent Tim Santel, Fish and Wildlife Service

3. Wade Steffen

B. Exhibits:

1. Traffic report dated 3 November 2013

2. "Criminal Nature" report from IFAW

3. "Legal Trade of Africa's Rhino Horns" from Science Magazine

4. "60K a pound," Washington Times article from May 17, 2015

5. "Like Cocaine Minus the Risk, Rhino Horn Trade Explodes in Africa," International Business Times article from April 9, 2014

6. Des Moines Register articles from May 5 and May 6, 2015

7. World Wildlife Fund report

C. Issues:

1. What is the appropriate enhancement for the market value of the rhino horns trafficked by defendant pursuant to USSG §2Q2.1(b)(3)(A)?

2. Whether defendant should receive a two-level enhancement for his role in the offense under USSG §3B1.1(c)?

## II. FACTUAL STATEMENT

### A. Introduction

The government's prosecution of defendant is part of an ongoing, multi district law enforcement operation known as Operation Crash.[1] Operation Crash, led by the Fish and Wildlife Service, is an effort to detect, deter and prosecute those engaged in the illegal trafficking of rhinos and other protected species. The demand for rhino horn has increased dramatically over the last decade and the value of rhino horn, which is believed to have medicinal purposes in some parts of Asia, has also risen sharply. The final retail sale price of rhino horn in the black market can reach $30,000 a pound (Exhibit 2 at 6) or more (*See* Exhibit 4 at 1 (citing ecology professor who was lead author on study regarding rhinos, finding rhino horn can sell for $60,000 a pound)). The market for rhino horns, both those currently being poached and horns that may have been legally harvested in the past, has grown, and illegal trafficking in such horns has concomitantly grown, transforming into a large, global industry. (Exhibit 2 at 6).

### B. Defendant's Involvement in Trafficking Rhino Horns

In 2011, defendant was involved in the purchase and resale of at least two sets of black rhino horns. (PSR ¶¶6-7). In approximately April 2011, defendant, who had been dealing directly in sales of wildlife with an individual named Felix Kha,[2] contacted Kha and indicated he had a set of black rhino horns for sale.[3] Kha

---

[1] A "crash" is the term for a herd of rhinoceros.
[2] Felix Kha operated Win Lee Corp. in California. Kha was previously prosecuted in federal district court for the Central District of California, in case number 12-CR-202-CAS-3, for his involvement in the trafficking of rhino horns.

3

then sent a text message to Wade Steffen to ask Steffen to arrange for the purchase of the rhino horns from defendant. Steffen, who had previously been introduced by Kha to defendant, arranged to meet defendant at Steffen's parents' home in Richmond, Illinois, to complete the transaction. Steffen paid defendant $40,000 for the set of horns, which weighed approximately eight pounds. (PSR ¶6). During this transaction, defendant asked Steffen to create an affidavit that would indicate the rhino horns were legally transferred in intrastate commerce; Steffen refused to do so, indicating defendant should have received such an affidavit from the original seller of the horns.[4]

In August 2011, Christopher Melgard, a resident of Oregon, advertised on the internet that he was selling a pair of black rhino horns. (PSR ¶7). Defendant contacted Mr. Melgard and arranged to buy the horns from him for $16,000. *Id*. Defendant told Mr. Melgard that he had arranged for someone else in Oregon to buy the horns, but defendant eventually contacted Steffen to see if Steffen would be interested in another pair of black rhino horns. *Id*. The two agreed to buy the horns from Mr. Melgard, with defendant first going to get $17,000 from Steffen's

---

[3] The government expects additional details of defendant's transactions beyond what is set forth in the PSR to be elicited during the testimony of the government's witnesses at the sentencing hearing in this matter and, therefore, has not provided citations to the PSR for all factual statements in this memorandum.

[4] In his objection to paragraph 6 of the PSR, defendant indicates he purchased this set of rhino horns from Delores Partoll in Palos Heights, Illinois. Law enforcement did not learn of the April 2011 transaction until a proffer interview with Steffen in June 2012 and, even at that time, Steffen did not know exactly where the black rhino horns came from. According to an online obituary, there was a Delores Partoll living in Palos Heights, Illinois, but she passed away in early 2012. See Obituary for Delores Partoll, available at
http://www.legacy.com/obituaries/chicagotribune/obituary.aspx?pid=155700190 (last visited September 28, 2015). However, even if defendant did purchase the horns in Illinois, the government believes the evidence will establish by a preponderance that he knew Steffen would be transporting the horns out of Illinois, to Kha in California, and, therefore, the April 2011 transaction/horn set is properly scored as relevant conduct.

parents in Illinois and then travelling to Oregon to complete the deal on August 23, 2011. *Id.*

Upon meeting with Mr. Melgard, defendant gave him a copy of an Oregon driver's license purporting to be the ultimate buyer of the rhino horns, though this person, as defendant then knew, had no involvement in the rhino horn transaction. *Id.* Defendant then paid Mr. Melgard $16,000, removed the horns from the rhino mount, and arranged to have the horns shipped back to his home in Maquoketa, Iowa. (PSR ¶8). On August 24, 2011, defendant sent a text message to Steffen, indicating defendant had the horns at his home and that the horns weighed ten pounds. *Id.* Defendant then met with Steffen in Davenport, Iowa, and gave the horns to Steffen, aware that Steffen intended to send the horns to Kha in California. *Id.*

### III. Defendant's Offense Level Should be Enhanced by 14 Levels Under USSG §2Q2.1(b)(3)(A) Because the Market Value of the Horns he Trafficked Exceeds $400,000

Defendant objects to a 14 level enhancement for the market value of the black rhino horns exceeding $400,000. (PSR ¶16). Pursuant to USSG §2Q2.1(b)(3), which cross references to the value table found in §2B1.1, the offense level is enhanced based upon the "market value" of the wildlife at issue. In this case, the PSR scores defendant with a 14 level increase based upon a market value of $540,000. (PSR ¶16). Defendant objects to this scoring and argues the market value should be less for two reasons: first, because the April 2011 rhino horns should not be included in the market value calculation and, second, because the

5

PSR used a $30,000 a pound retail price to determine the fair market value. Instead, defendant contends the market value should be $50,000, based upon the sale of the August 2011 horns to Felix Kha. Both arguments fail and the Court should enhance defendant's offense level by 14.

> **A.** **Defendant's trafficking of a set of rhino horns in April 2011 is relevant conduct and should be considered in determining the enhancement for market value**

Defendant objects to the inclusion of the set of rhino horns he transferred to Steffen in April 2011 in the calculation of the market value of the trafficked wildlife. Defendant contends his sale of this set of horns, which weighed approximately eight pounds, was legal because, according to him, he purchased the horns in Illinois and transferred the horns to Steffen in Illinois.[5] Therefore, according to defendant, he did not illegally traffic black rhino horns across state lines in April 2011. Defendant's argument fails because, as established by a preponderance of the evidence, defendant was aware that the horns would be transported to at least California and his involvement with these horns is properly considered relevant conduct and should be included in the market value calculation.

When applying specific offense characteristics, such as the enhancement for market value under USSG §2Q2.1(b)(3), the Court considers all relevant conduct, which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and

---

[5] It is a crime under federal law to engage in the interstate trafficking of black rhino horns, but federal law does not criminalize the intrastate sale of such horns.

6

omissions of others in furtherance of the jointly undertaken criminal activity." USSG §1B1.3(a)(1)-(2).  If joint criminal activity includes contraband, "the defendant is accountable for all quantities of contraband with which he was directly involved and . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."  USSG §1B1.3, comment. (n.2).

Here, defendant apparently disputes whether the April 2011 horn should be considered relevant conduct.  However, defendant, even if he purchased the rhino horns at issue in Illinois and gave them to Steffen in Illinois, could at the least reasonably foresee that Steffen, with whom he was engaged in joint criminal conduct starting at least at the time of this transaction, would further transport those horns out of Illinois, specifically to Felix Kha in California.  Defendant and Steffen met because Kha introduced them.  Defendant and Steffen were engaged in this rhino horn transaction only because Kha had sent a text message to Steffen, asking him to work with defendant on the transaction, after defendant had initially contacted Kha about the rhino horns at issue, presumably because defendant knew Kha would be willing to pay for the horns.  There is no indication Steffen ever planned to keep the horns in Illinois.  Further, during phone conversations later in 2011 and 2012 with an undercover law enforcement agent, defendant demonstrated he knew that the market for rhino horns was overseas, even if during those conversations he was telling the undercover officer the horns had to stay in the

7

state of sale. (PSR ¶9).[6] During 2011, while engaged in the illegal trafficking of black rhino horns, defendant demonstrated he was willing to deal in interstate sales and cannot now argue he had no idea that the horns he had offered to Kha would leave Illinois after defendant gave them to Steffen. Defendant knew, or at least it was certainly reasonably foreseeable to him, that those horns would leave Illinois and end up in at least California with Kha. The April 2011, eight pound set of horns is properly considered relevant conduct and should be considered in the calculation of the market value for purposes of USSG §2Q2.1(b)(3).

> B. **A Reasonable Estimate of the Market Value of the Rhino Horns Defendant Trafficked is $30,000 a Pound, for a Total Value of Approximately $540,000**

Defendant also disputes the PSR's recommendation that the market value of the rhino horns in this case be calculated using a value of $30,000 a pound, which, considering both set of horns at issue, results in a total market value of approximately $540,000.[7] Defendant does not object to the weight of the horns as set out in the PSR, therefore, the Court must only determine a reasonable approximation for the market value of the horns.

Unlike drug cases, in which a defendant's sentencing range is often dependent upon a relatively objective measure of the weight of the drugs at issue,

---

[6] Defendant demonstrated the beginnings of a pattern of telling people he was hoping to buy rhino horns from that the horns had to stay in the state of sale, telling both the seller of the August 2011 horns in Oregon and the undercover law enforcement officer that the horns would be staying in Oregon and Indiana, respectively. (PSR ¶¶7, 9). In the case of the purchase in Oregon, defendant clearly did not intend to keep the horns in the state, having already arranged to transfer the horns to Steffen before defendant even purchased them in Oregon. (PSR ¶7).

[7] The April 2011 set of horns weighed approximately eight pounds and, at $30,000 a pound, had a market value of $240,000. (PSR ¶6). The August 2011 set of horns weighed approximately ten pounds and, at $30,000 a pound, had a market value of $300,000. (PSR ¶8).

8

the sentencing range in this case is dependent upon a more subjective measure, specifically the market value of the horns. USSG §2Q2.1(b)(3)(A). "Market value" is to be based upon "the fair-market retail price" of the wildlife, if such information is "reasonably available." USSG §2Q2.1, comment. (n.6). If "the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information." *Id*. While the government does not believe there is a definitive market value for black rhino horns, there will sufficient evidence in both the government's exhibits[8] and witness testimony to allow the Court to make a "reasonable estimate [of the fair-market retail price] using any reliable information." USSG §2Q2.1, comment. (n.4).

A preponderance of evidence establishes that $30,000 a pound is a reasonable estimate of the fair market retail value of the rhino horns. First, in a statement dated 3 November 2013, Thomas Milliken, Elephant and Rhino Programme Leader of TRAFFIC International, estimates that the end value of rhino horn at the end of the trade chain is $45,000 a kilogram, or approximately $20,454 a pound. (Exhibit 1 at 3).[9] Second, a June 2013 report from the International Fund for Animal Welfare specifically aimed at discussing the global security implications of illegal wildlife trade cites a retail value of $30,000 a pound for rhino horn on the black market. (Exhibit 2 at 6). Third, a March 2013 article in Science magazine found

---

[8] A number of the government's exhibits are lengthy articles discussing the trafficking of rhino horns or other wildlife in general. Those exhibits are offered both as overall context for the impact of illegal wildlife trafficking, but also specifically to aid the Court in making a reasonable estimate of the retail value of the horns at issue. The government will cite to specific portions of these exhibits within this brief it believes will assist the Court in making this determination.

[9] The government has requested Mr. Milliken provide an update to this statement. As of the submission of this memorandum, the government has not yet received this update. If the government does receive an update, it will file it as an additional exhibit.

9

that rhino horns were selling for $65,000 a kilogram, or approximately $29,545 a pound, in 2012. (Exhibit 3 at 1). Fourth, news articles have reported values of $60,000 a pound (Exhibit 4 at 1) and nearly $30,000 a pound (Exhibit 5 at 1). Finally, a World Wildlife Fund report indicates that rhino horns sell for around $60,000 a kilogram, or approximately $27,272 a pound, and that it is worth more than twice the value of gold and platinum. (Exhibit 7 at 11). In short, most studies indicate the value of rhino horns as being between $20,000 and $30,000 a pound. The government expects to present additional testimony at the sentencing hearing from a law enforcement officer from the Fish and Wildlife Service supporting the proposition that $30,000 a pound is a reasonable estimate.

Even if the Court finds a lower value per pound is a reasonable estimate of the fair market value, defendant's enhancement pursuant to USSG §2Q2.1(b)(3)(A) will be 14 levels unless the Court finds the overall value of the horns does not exceed $400,000. *See* USSG §2Q2.1(b)(3)(A) (citing USSG §2B1.1, which requires a 14 level enhancement for market value of in excess of $400,000 but not more than $1,000,000 and a 12 level enhancement for market value in excess of $200,000 but not more than $400,000). Therefore, if the Court finds defendant should be assessed with a market value for both sets of rhino horns, which total 18 pounds, as long as the Court finds the per pound market value of the horns is more than $22,222.28,[10] the Court should find defendant should be assessed with a 14 level enhancement. If the Court finds the per pound market value of the horns is

---

[10] $400,001 divided by 18 pounds of rhino horns.

10

between $11,111.17[11] and $22,222.28, the Court should assess defendant with a 12 level enhancement for the market value being greater than $200,000 but no more than $400,000.

Defendant argues the Court should only assess the value of the August 2011 horns at $50,000, resulting in a 6 level enhancement. (PSR ¶16). $50,000 is the amount Steffen received from Kha as payment for the horns (PSR ¶8), but is not a reasonable estimate of the fair market retail price of the horns. The amount paid by Kha to Steffen is only an early link in the chain of trade for rhino horns. The actual market for horns is overseas and that retail value is the appropriate value to use in determining an enhancement under USSG §2Q2.1(b)(3)(A). *See United States v. Eyoum*, 84 F.3d 1004, 1007 (7th Cir. 1996) (finding that the price defendant sold wildlife for was not the appropriate measure of value under USSG §2Q2.1(b)(3)(A)); *see also United States v. Borden*, 10 F.3d 1058, 1063 (4th Cir. 1993) (upholding enhancement under USSG §2Q2.1(b)(3)(A) based upon market value of wildlife rather than the defendant's profits). Defendant may argue he should be sentenced according to the value he and Steffen placed on the horns rather than the market value, but this is appropriate only when no market value is reasonable ascertainable, which is not true in this case. *United States v. Oehlenschlager*, 76 F.3d 227, 229 (8th Cir. 1996). Therefore, defendant's sentence should be enhanced by the fair market retail price under USSG §2Q2.1(b)(3)(A), not based upon the price of the horns when sold to Kha.

---

[11] $200,001 divided by 18 pounds of rhino horns.

## IV. Defendant's Offense Level Should be Enhanced by Two Levels Under USSG §3B1.1(c) Because of his Role in the Offense

Defendant's offense level should be increased by two levels because of his role in the criminal activity at issue, namely the trafficking of the August 2011 rhino horns, pursuant to used sophisticated means under USSG §3B1.1(c). An adjustment under this section is appropriate when "defendant was an organizer, leader, manager, or supervisor in any criminal activity[.]" USSG §3B1.1(c). "[W]hen considering whether §3B1.1(c) applies, it is unnecessary to determine whether the defendant was a mere 'manager or supervisor' or instead was a more responsible 'organizer or leader.'" *United States v. Jackson*, 639 F.3d 479, 483 (8th Cir. 2011). Still, Application Note 4, which discusses the distinction between "manager or supervisor" and "organizer or leader," remains "a helpful guide in determining whether §3B1.1(c) should be applied to a defendant." *Id.*

Application Note 4 lists several factors that the court may consider, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree or participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG §3B1.1, comment. (n.4). The terms "manager" and "supervisor" are construed broadly. *United States v. Payton*, 636 F.3d 1027, 1048 (8th Cir. 2011). Further, there is no "strict condition requiring evidence of control or decision making authority over one or more accomplices as an absolute prerequisite for a manager/supervisor enhancement under USSG §3B1.1."

12

*United States v. Gaines*, 639 F.3d 423, 428 n.4 (8th Cir. 2011). For example, "the simple fact that a defendant recruits new members into a conspiracy supports a finding of the defendant being a manager or supervisor." *Payton*, 636 F.3d at 1048. Degree of control and decision making authority "are but two of several factors in a non-exhaustive list[.]" *Gaines*, 639 F.3d at 428.

Here, defendant recruited Steffen to participate in the August 2011 sale of rhino horns to Kha. While Steffen had already been involved in the illegal trafficking of horns, it was only because defendant contacted him and recruited his assistance that Steffen participated in the purchase and sale of the horns in August 2011. (PSR ¶7). Further, it is clear defendant was the driving force, the organizer, for the August 2011 horn purchase and resale. Defendant not only contacted Steffen, he also, as the PSR notes, located the horns in Oregon, contacted the seller in Oregon, negotiated the price of the horns, arranged the purchase and exchange, shipped the horns from Oregon to Iowa, and arranged the meeting with Steffen. (PSR ¶¶7-8). Defendant may not have exercised control over Steffen, but he recruited Steffen into the transaction and then exercised control over the transaction from that point on, until he ultimately surrendered the horns to Steffen. Therefore, defendant is eligible for and should receive a two level enhancement for his role in the offense.

## V. Conclusion

Based on the above, the United States contends the sentencing guidelines should be applied as follows before the Court rules on Acceptance of Responsibility:

| | |
|---|---:|
| Base offense level (§2B1.1) | 6 |
| Market Value (§2Q2.1(b)(3)(A)) | +14 |
| Role in the Offense (§3B1.1(c)) | +2 |
| Adjusted Offense Level | 22 |

Respectfully submitted,

KEVIN W. TECHAU
United States Attorney

By, /s/ Anthony Morfitt

ANTHONY MORFITT
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401-2101
(319) 363-6333
tony.morfitt@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on September 28, 2015.

UNITED STATES ATTORNEY

BY: /s/ LBurns

COPIES TO: Melanie Keiper
US Probation